**Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor, Plaintiff,**

**v.**

**BARGER CONSTRUCTION COMPANY, Inc., a Corporation, Defendant.**

**Civ. No. 438.**

United States District Court
W. D. North Carolina,
Statesville Division.

Argued Oct. 15, 1962.

Decided Nov. 15, 1962.

———◆———

Reuben S. Haslam, Birmingham, Ala., for plaintiff.

W. Faison Barnes, Charlotte, N. C., for defendant.

CRAVEN, Chief Judge.

Are employees of a construction company engaged in building a new manufacturing plant in an occupation closely related to and directly essential to the production of goods for interstate commerce?

No talismanic or abstract tests, embodied in tags or formulae, can do service for judgment or dispense with painstaking appraisal of all the variant elements which must be considered to determine coverage under the Fair Labor Standards Act. Mitchell v. H. B. Zachry Co., 362 U.

S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753; 29 U.S.C.A. § 201 et seq.

With the consent of the parties and pursuant to Federal Rules of Civil Procedure rule 39, the court finds the facts to be as follows:

The controversy arises out of the construction by the defendant of an industrial plant facility at Tifton, Georgia, for the Peerless Division of Burlington Industries. The concerned employees were employed from July 8, 1959 to January 20, 1960. It is agreed that defendant failed to pay overtime compensation for hours in excess of forty per week, and the amount of monies involved as to each employee is stipulated.

The Peerless Division consisted of plants at Cleveland, Tennessee; at Rossville, Georgia; and at Tifton, Georgia. All the plants were under the supervision of one general manager and together constituted the woolen fabric manufacturing division of Burlington Industries. The Tifton plant was, until 1959, engaged in manufacturing woolen fabric for men's wear from stock-dyed wool. The raw wool was scoured and stock-dyed at the Rossville plant. It was then shipped to the Tifton plant where it was processed into woolen fabric. The fabric was shipped to the Rossville plant for finishing.

In 1959, management, because of an unfavorable market for men's wear woolens, decided to start producing a woolen fabric, entirely new with Burlington, for women's sportswear. The old Tifton plant could not be used to manufacture both materials. A complete separation was necessary. Defendant constructed a new plant several miles from the old Tifton plant.

Most of the machinery in the old plant was installed in the new plant. Basically, the same type of machinery was used for both products. The old machinery was simply reworked to put it in shape to produce quality yarns. Part of the old plant was converted into a warehouse. The remainder of it was used to house a new blending and picking system that prepared the wool for the new plant. A new and separate finishing facility was installed at the Rossville plant to finish the new fabric. A new sales division was established by Burlington for the purpose of marketing the new fabric. After a retraining period, a considerable number of the employees from the old plant were re-employed in the new plant; employment at the old plant was about 150 people; the new one employed about 300 more, or approximately 450 people.

Actually, there is virtual agreement between the parties on the facts—both relying upon the deposition of E. H. Hines, Jr., President of Peerless Woolen Mills. The defendant contends, however, that the court should draw the inference that the entire new process begins at the new Tifton, Georgia plant. But it is clear that the scouring of the wool is not done at the new plant. The new plant operation consists of blending through the weaving of cloth, and it is plain that scoured wool is shipped into the Tifton plant. Except on this point, which does not seem to be of controlling importance, the parties are not in disagreement as to the facts.

The manufacturing cycle for the new fabric consists of the following elements: scoured wool is shipped into the old Tifton plant where it is picked, blended, and re-baled; this wool is sent to the new Tifton plant where it is processed into fabric; the fabric is shipped to the Rossville plant for finishing.

It is the Secretary's position that during the time that defendant's employees were engaged in the construction of the new Peerless plant at Tifton, Georgia, they were engaged in the "production of goods for commerce" within the meaning of the Fair Labor Standards Act, and entitled to be paid for overtime at the rate specified in section 7(a) of the Act (29 U.S.C.A. § 207(a)).[1] The Secretary's as-

1. "§ 207. Maximum hours. (a) Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged *in commerce* or in the

sertion is premised on the thought that the new plant is an extension and replacement of a production facility previously engaged in the production of goods for commerce.[2] Defendant argues, on the other hand, that the new plant is an entirely new operation, unrelated to any previous facility, and not an extension or replacement.

Until 1955 the generally accepted theory was that employees engaged in "new construction" were not covered by the Act. In that year it was held in Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196, that the test really is "whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity."

Defendant relies very heavily upon Mitchell v. Tune, D.C., 178 F.Supp. 138 (1959). In that case an Ohio manufacturer of organs built a plant in Arkansas for the production of a completely new type of organ. The court held that the employees of the contractor who built the new plant were not engaged in the "production of goods for commerce" for the reason that the new plant was not such an extension of the Ohio plant as to be an integral part thereof.

That court, however, gave little or no weight to Vollmer. It noted that that case was concerned "with employees who were *'engaged in commerce'* rather than *'in the production of goods for commerce.'* " The court in Tune added that "(t)he effect of the Vollmer decision on the 'new construction doctrine' as applied to workers engaged in the production of goods for commerce is somewhat in doubt."

If so, that doubt has now been resolved by Mitchell v. H. B. Zachry Co., 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753 (1960), which establishes that the Vollmer rejection of the "new construction" rule is *not confined* to coverage under the "in commerce" provision of the Act, but extends to the "production of goods for commerce" clause as well.

■ Zachry and Vollmer destroy the old notion that coverage under the Act can be made to turn on "new construction". Whether a facility is "new construction" or is an addition or extension of an old facility is still a relevant factor, to be considered with all other facts and circumstances, but that alone is not determinative. See: Goldberg v. Nello L. Teer Co., D.C., 208 F.Supp. 552 (1962). The so-called "new construction" rule no longer prevents coverage under the Fair Labor Standards Act. Goldberg v. Wade Lahar Construction Co., 8 Cir., 290 F.2d 408, cert. denied 368 U.S. 902, 82 S.Ct. 176, 7 L.Ed.2d 96 (1961).[3]

■ It is now established that there are three gradations of coverage under the Act. Mitchell v. H. B. Zachry Co., 362 U.S. at 316, 80 S.Ct. at 743, 4 L.Ed. 2d at 759. See also A. B. Kirschbaum Co.

---

*production of goods for commerce* for a work week longer than forty hours, unless such employee received compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." (Emphasis added)

2. The basis of this contention apparently lies in Title 29 C.F.R. sec. 776.27(c) which was issued by the Administrator after the decision in Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860 (1955) and reads as follows:

   "(1) Construction of a new factory building, even though its use for interstate production upon completion may

be contemplated, will not ordinarily be considered covered. However, if the new building is designed as a replacement of or an addition or an improvement to an existing interstate production facility, its construction will be considered subject to the act.

   "(2) If the new building, though not physically attached to an existing plant which produces goods for commerce, is designed to be an integral part of the improved, expanded or enlarged plant, the construction, like maintenance and repair, would be subject to the act."

3. This case contains an examination and listing of the Supreme Court cases decided under the Act.

v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638:

(1) Employment *in commerce* is most affected with the national interest and least affected by local interest;

(2) Employment *in production for commerce* is a step removed from the former, and therefore, from the national concern;

(3) Employment in *an activity which is closely related to the in production for commerce* category is furthest removed in the scheme of the statute from the hub of the national interest in commerce upon which a limited displacement of state power is predicated.

The peripheral third gradation or category was restricted by Congress in 1949 when the last clause of section 3(j) of the Act (29 U.S.C.A. § 203(j)) was amended to read:

"(F)or the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed * * * in any *closely related process or occupation directly essential to the production thereof,* in any State." (Emphasis supplied.)

Before the amendment, production activity not in or for commerce was required only to be *"necessary"* thereto in order to be covered by the Act. The restrictive language now in the Act requires that such activity be *"closely related"* or *"directly essential"* to the production of goods for commerce.

Construction may be sufficiently "closely related" to production to place it in that proximity to "commerce" which the Act demands as a predicate to coverage. Mitchell v. H. B. Zachry Co., supra. Whether it is so closely related as to fall within the third category of coverage depends upon the facts in each case. Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

"What is finally controlling in each case is the relationship of the employment to 'commerce.' in the sense of the statute."

Mitchell v. H. B. Zachry Co., 362 U.S. at 320, 80 S.Ct. at 745, 4 L.Ed.2d at 762. In the final analysis a judgment of this nature must be based upon practical considerations rather than legalistic niceties. Mitchell v. H. B. Zachry Co., supra; Mitchell v. C. W. Vollmer & Co., supra.

■ This court is convinced by the facts of the instant case and the law applicable thereto that defendant's employees were engaged in the production of goods for commerce within the meaning of the Act when they constructed the new Peerless plant at Tifton, Georgia.

Both before and after the construction of the new plant, Peerless was in the business of manufacturing woolen fabrics. The changes required to make the new fabric included reworking the old machines. It is significant that the old machines could be, and were in fact, used in the new process. This is not a case of going into a new business but simply of internal adjustments to expand into a more lucrative line of an old business, i. e., the manufacture of woolen fabrics. The increase of employment from 150 persons to 450 persons establishes beyond all question that the effect achieved was an expansion of the woolen fabric business, which expansion was accomplished by the new Tifton plant facility used in an integral relationship with the old plant facility—most of which was used as a warehouse, and a part of which was used for the picking and blending part of the process. It is clear that the new Tifton plant replaced in part the old plant, and there resulted an integrated processing circuit between new plant, old plant, and a finishing facility installed at the Rossville plant. There resulted an enlarged and improved manufacturing capacity to make woolen products for interstate commerce. It is not disputed that the new plant was dedicated to the production of goods for commerce.

The construction of the new plant was an integral part of the sequence of activities leading to the production of a different fabric that was to be placed in the channels of commerce, not a mere localized activity insignificantly related thereto.

Construction of the plant was so "directly essential" and "closely related" to actual production in or for commerce as to be within the peripheral area of the third category set out in Mitchell v. H. B. Zachry Co., supra, and, therefore, within that proximity to commerce which the Act demands as a predicate to coverage.

The Court pointedly observed in Zachry that the construction there was *not* of a production facility but would "merely support production facilities". The facility here in question is, without qualification, a "production" facility, the goods from which will enter into commerce.

"(W)hen lines have to be drawn they are bound to appear arbitrary when judged solely by bordering cases. To speak of drawing lines in adjudication is to express figuratively the task of keeping in mind the considerations relevant to a problem and the duty of coming down on the side of the considerations having controlling weight." 10 East 40th St. Building, Inc. v. Callus, 325 U.S. 578, 584, 65 S.Ct. 1227, 1230, 89 L. Ed. 1806.

Controlling weight here is on the side of the Secretary.

Judgment will be entered in accordance with this opinion.